REGAN, Judge.
Plaintiff, a laborer employed by defendant, .Texas Company, allegedly at a wage rate exceeding $40 per week, instituted this suit against defendant and its insurer, the Maryland Casualty Company, for total and permanent disability under the Workmen’.s Compensation Act of Louisiana, Act No. 20 of 1914, as amended, claiming that, because of certain injuries received by him on or about February 27, 1946, -he is entitled to 400 weeks compensation at the rate of $20 per week, plus medical expenses,, subject to deduction for.all. compensation payments and medical expenses that were previously made. ...
Defendants answered admitting both the employment and the occurrence of the accident ; that plaintiff was' disabled for a period of 13 weeks, during which time he was paid $260 compensation, plus medical expenses amounting to $289.96; that the average weekly. wage rate of plaintiff .was $32 per week rather than the sum of $40 per week; and, in the final analysis, defendants deny that plaintiff is totally and permanently disabled and maintain that there are no further compensation or medical payments due to him.
*113 The court, a qua, found plaintiff totally and permanently disabled and rendered judgment in favor of plaintiff at the rate of $20 per week, not to exceed 387 weeks; together with interest and costs, and from that judgment defendants have prosecuted this appeal.
The record reveals that the accident occurred on or about February 27, 1946, while plaintiff was digging a hole for the purpose of laying therein a fuel storage tank at a service station in the City of New Orleans. The side or wall of the excavation unexpectedly collapsed burying the plaintiff with mud. Plaintiff contends that he was extricated therefrom by virtue of a rope being placed under his armpits and attached tó a truck which removed him from the hole.
Defendants admit the extrication of plaintiff from the hole through the medium of a rope being placed under his armpits, but deny that any truck was used in raising plaintiff.
However, the record reveals that it is undisputed that plaintiff was an employee of the Texas Company working within the scope and course of his employment on February 27, 1946, the day on which the accident occurred and that he was digging a hole intended to contain a fuel storage tank at a New Orleans Service Station. ■ When the hole had been excavated to a depth of nine feet, one of the perpendicular walls, measuring approximately five feet long, two and one half feet wide and eight- or nine inches thick unexpectedly collapsed burying plaintiff’s body with the exception of his shoulders and head; that thereafter the employees of the defendant, Texas Company, endeavored to extricate plaintiff by placing a rope under his armpits and then applying force through the medium of several men to the other end of the rope for the purpose of pulling his body from the mud in which he was buried. We conclude from the evidence contained in -the record that no truck or tractor was used for this purpose.
. It is obvious to us that the injury of which plaintiff complains could have been received by him by virtue of the foregoing accident. In any event we are confronted with the solution of -the result rather than the cause in viéw of the fact that' during the trial on the merits the issue was confined to whether or not plaintiff sustained a rupture of the fifth intervertebral disc as a result of the accident. It will, therefore, be readily appreciated that the court, a qua, as well as this court, is confronted with only án enigmatical question of fact, much disputed by opposing counsel and their respective medical experts to the substantial extent of 210 pages of medical testimony involving, for the most part, the highly specialized field of neurosurgery. The case was tried on five different days extending over a period of six months from October 27, 1947 to April 14, 1948. . Six medical experts testified: Drs. John A. Col-dough, a neurosurgeon and E. H. Maurer, an orthopedist, on behalf of plaintiff and Drs, Gilbert C. Anderson, Howard H. Karr, neurosurgeons, Samuel B. Nadler, Internal Medicine, and Ralph J. Christman, general surgery, all on behalf of defendants.
■ The medical experts’ testimony was both voluminous and elaborate and each medical expert related in minute- detail as to how he arrived at the conclusion that plaintiff did or did not suffer a rupture of the fifth in-tervertebral disc as a result of the accident. However, the conclusions of the medical experts, in substance, were as follows:
Dr. Colclough -testified that:
“Q. Now, Doctor, as . a result of that examination, what was your diagnosis and conclusion ? A. My diagnosis was that the man was suffering from a ruptured fifth intervertebral- disc, lumbar - intervertebral disc, causing- sciatica on the right side by pressure upon the first sacral nerve root.
* * * * *
“Q. Now, Doctor, could a person complaining of the type of injury’which-your findings back up, could that person do heavy manual labor, such as the digging of holes, the use of shovels and lifting mud and that type of work as a .steady, every day means of employment? A. He could not,
. ,“Q.. It.is your, conclusion, then, that it would be impossible for this .patient, that *114 is, Walter Stanton, this plaintiff here, to do that type of work? Is that your opinion? A. That is correct.”
Dr. Maurer testified that:
“Q. Now, would you relate to the Court your diagnosis, your findings, and the basis on which you determined your findings? A. His complaints at that time were: Lower back hurts intermittently. Greatly influenced by rest. Much worse pain increased activity. Coughing and sneezing aggravates pain. The pain was localized over the fourth lamina. That is the inter-pace between the fourth and fifth lumbar vertebrae. Pressure over the spinous process of the fourth lamina and the fourth vertebrae produces acute pain and radiations of pain. The pain radiates to the hip and down the leg. The pain was complained of when the sciatica nerve was palpated. Hyperalgesia over the skin area of the lateral sciatic of the right side. Achilles and plantar reflexes on the right side were greatly diminished. I made a diagnosis of ruptured intervertebral disc.”
Dr. Anderson, who examined plaintiff once, on March 4, 1947, more than a year after plaintiff’s injury, testified that:
“Q. What were yoi.tr final conclusions on this patient ? A. Well, my final conclusion was, as I say, that the patient was definitely exaggerating his symptoms arid that he should he investigated further for the possibility of a ruptured disc. I didn’t consider that a ruptured disc had been excluded at that time, but it was impossible for me to conduct an examination that would satisfy me that it was or was not there with the lack of cooperation that I got from the patient. Now, apparently that suggestion was followed out, because the investigation was carried further, but not by me.
“Q. Was that the last time you saw him, Doctor ? A. That was the only time I saw him.
“The Court:'
“Q. That was the first and last time you saw him? A. Yes, sir.”
Dr. Karr, who examined plaintiff on May 8, 1947, or about 14 months after he was injured, testified:
“Q. In your opinion, did Walter Stanton, at that time, suffer from a ruptured in-tervertebral disc? A. In my judgment, unequivocally no.
* * * * * *
“Q. His work was that of a laborer, digging excavations in the ground for the sinkage of tanks. Would you say that you found his condition to be such that he could normally pursue that occupation ? A. Yes.
“Cross-Examination
“Mr. Culligan:
“Q. When you say unequivocally that a ruptured disc was not present, do I understand correctly that there is absolutely no doubt in your mind whatsoever that there is not a ruptured disc? A. That is correct. In this particular case, yes.
* * JjC * ‡ ‡
“Q. Well, I mean that there can be no doubt in your mind as to the conditions, let us say, prior to an actual opening of the body and the actually seeing inside? A. Well, if such a doubt existed and if such a doubt had to surround every diagnosis that I ever made, I would say that it would violate all conceptions that I have ever had of medicine or the understanding of physical diagnosis and the use of clinical judgment or the application of physiological principles which are involved in making a diagnosis.
* * * * * *
“Q. When this patient went to you, Doctor, it was with full knowledge on your part that it was simply for the purpose of an examination and not with the idea of treatment; isn’t that correct? A. Yes.”
Dr. Nadler, who examined plaintiff on November 3, 1946, or about eight months after he was injured, testified that:
“Q. Based on your examination, Doctor, would you say that your findings were consistent or inconsistent with a ruptured in-tervertebral disc? A. I might say that, at the time that I examined him, there was certainly no conclusive evidence that this patient had any organic disease. I don’t ■think that he evinced any of the symptoms that are characteristic of ruptured inter-vertebral disc.

******

*115 “Q. And you merely examined him on one occasion, as I understand it? A. Yes.”
Dr. Christman, employed by the Maryland Casualty Company, first examined plaintiff on February 29, 1946, two days after the accident, and treated him through May 28, 1946, when'plaintiff was discharged, testified that: ■ ■
“Q. Tell us, from the time you got on the case until the time that you discharged him, what you know about the matter, what tests you put him through and what your observations were? A. Briefly, he was first seen at Flint-Goodridge Hospital, where he had beén taken by ambulance and admitted on February 27, 1946. His statement to me was that he was standing, or working, in an excavated pit when a dirt slide occurred, burying the lower half of his body, and he further stated that he had to be pulled out by some contrivance with ■ ropes that were secured under his arms. At that time, he was in bed, complaining of pains in both legs, right knee and ankle, pain in both shoulders and in the low back. Examination showed no external evidences of injury such as contusions, lacerations, discoloration or swelling. His principal complaint was the back, the right knee and the right ankle. X-ray studies were made of the spine, of the entire spine, of the left knee and the left ankle, the reports of which are all negative for bone injury. He remained pretty much in bed — .
******
“A. * * * During the time that he came to the office, why, he did continue to complain of pain down the back of the right leg as far as the knee. I have no record in my notes of any complaint or discomfort below the knee, but he did complain of pain from the lumbo-sacral region of the back down to the right knee, down the posterior surface.
******
“Q. In your opinion, was he disabled or was he able to go back to his former occupation at the end of 14 weeks from February 27, 1946? A. That was my idea. On May 28, I instructed him that, in our opinion, he,could and should return to work.”
On cross-examination Dr. Christman testified: . • '
• “Q. When did you prescribe the lumbo-sacral belt? -A. Well, I thought thát question was coming. My notes don’t show a record :of it. The record over here shows a statement from Mr. Weber that was dated May 21, and it also stated that it was au-' thorized by Dr, Bradburn. ■ That might be an error. It may have been authorized by, me. That, I don’t know. ; ;•
■ “Q. Now, what is the purpose of that belt, Doctor ? A. The purpose of the belt usually is to immobilize partially the lower-back and give a firm support.
“Q. And, what was the date that you discharged Stanton? A. One week later. ’
“Q. At the time he was discharged, Was, he wearing the belt? A. I don’t remem--ber.
“Q. You'did not tell h'im to cease using the belt? A. I think not.”’ ,
■Dr. Anderson,- on tross-examination, testified :
“Q. Now, would you, or have you, Doctor, ever discharged anyone, and prescribed a lumbo-sacral belt, at which time the person was informed that they were physically fit to return to the occupation of ditch-dig-, ging or shoveling mud? .A. I never ¡have, ■ no.
“Q. Have you ever heard of that being done? A. Not until you mentioned" it.”
Counsel for the defendants in maintaining that -the court below erred, have stressed the efficacy, the accuracy and, through the medium of Dr. Karr, the absolute infallibility of the myelogram test “when it is negative”, as it was in this case, in determining whether plaintiff sustained a rupture of the fifth intervertebral disc as a result of the accident.
Dr. Karr, testifying with respect to the-, accuracy of the myelogram, said:
“Q. Did you conduct any myelogram, test on him? A. Yes.
“Q. Would you tell us what — first, tell, the Court what- that test is’ and how'-it -is -accomplished and the purpose of it? A. Well, the myelogram is simply a method of *116 visualization of the spinal canal by the use of some medium which will cast a shadow on a fluoroscopic screen or on an X-ray plate. It is a manner of visualization of the spinal, canal analogous to the visualization of .the stomach by the use of barium or by the use of water or any other medium which is considered a contrasting medium.
"Q. What reliance do doctors place upon that test for diagnostic purposes? A. From a neurological point of view, I consider the myelographic test absolutely indispensable in so far as conclusively establishing the diagnosis of a ruptured disc.”
On cross-examination, Dr. Karr testified:
“Q. Doctor, isn’t it a bit unusual for most of the members of your profession to make the type of statement you have just made ? A. I don’t think so. In what manner ?
******
“Q. With relation to the myelogram test, would you say that that is in common use today? A. Yes, I would say very common.
“Q. If you know, in this area around New Orleans, about what percentage of neurosurgeons and other professional people use this test? A. Well, to my knowledge, there are three qualified neurosurgeons in this State — to my knowledge, and I think that I am correct. One is Déan Echols, the other is Gilbert Anderson—
“Mr. Rosen:
“Q. And who is the third?' A. Myself.
* * * * ■ * *
“Mr. Culligan:
“Q. Do you represent,. then, that anyone who calls himself a— A. Just a minute. I haven’t answered the question. You asked me whether it was in general use or not, and I just commented on the fact that, to my knowledge, there are three qualified neurosurgebns now. Myelography I don’t' think has been practiced in this state to any extent because it has been the clinical impression of my colleagues in the field that they could usually make a diagnosis of a ruptured disc on clinical grounds alone. * * *
“Q.. *■ * *. Do you feel that a myelo-gram test with a showing of negative, in and of itself, is conclusive? A. Yes, I certainly do.
“Q. By that, you mean, then, that there is nothing whatsoever wrong whether it be disc or anything? In other words, anything that may exist in the area can’t exist if it is negative; is that what you are say-iiig? In other words, I understand as a layman, that there are various other things that might show on a myelogram test? A. Yes.
******
“The Court: Let us get it on the disc, Doctor.
“A. As far as myelogram referred to a- disc is concerned, I am perfectly satisfied that that is the diagnostic procedure of choice and it is a procedure that should be carried out, and when it is negative, you can.put it down that the man doesn’t have a disc..
“The Court:
“Q. It is conclusive when it is negative? That is your testimony? A. Yes.
* * * * * *
“Q. Now' I understood you in effect to testify previously that it is somewhat dependent oh the person performing the my-elographic test as to whether or not it could be 'said with all conclusiveness it could be relied upon, and that you felt that you were proficient to the point you could state it was a conclusive test, is that correct ? A. Yes, not only do I feel that I have arrived at that proficiency but I consider myself authoritative.
“Q. You then— A. (interrupting) This might Be contrary to what Doctor Gray or any other texts you may have reference to —I am only reading'your mind now—
“The Court: Do not read his mind. Answer the question.”,.
Dr. Gilbert Anderson testified:
“Q. Oh yes. With reference to the my-elogram; Doctor, is it your opinion that the myelogram test is conclusive in its findings ? A. It very often is strongly suggestive, as so many other X-rays are, but when we use *117 the word ‘absolute’, or ‘conclusive’ and so forth in connection with various mechanical tests, we frequently go a little hit too far. But we do think that the myelogram is of definite value, otherwise we wouldn’t use it.”
Dr. Samuel Nadler testified:
“Q. Now, is that true in the negative? By that, I mean, is there any way óf determining, or has there been any survey made in such a way that could give the percentage where a negative finding on the myelo-graphic test is made. Do you know of any such? A. No, I don’t know of any such series. However, this much is true, and that is, that in any medicine, there almost never is absolutism. I think that is a fair statement. And certain positions of ruptured discs may occur which are difficult to visualize myelographically. * * * ”
Dr. John Colclough testified:
“Q. And, as I understand it, Doctor, the results of a myelogram test are not diagnostic. Is that the way you would express it ? A. .That is correct. The result of the myelogram is not diagnostic, it is confirmatory only.
* * * * * 4¡
“Q.' I understand you to say two thirds ■of the operations of this sort at Charity Hospital are performed by you at this time ? A. Neurosurgical operations, approximately two-thirds.
* * * * * *
“Mr. Rosen:
“Q. You did not state to the court two •things: first, do you attach any importance to the test, do you use it in connection with ;your own practice? Number 1. And, sec■ondly, in what percentage of the cases do you find a positive myelographic test when you operate and find there is a ruptured disc? I mean you gave three illustrations ■of when you operated and it was inconsistent with the test? Haven’t you got many •cases to the contrary ? A. Not very many. I have a couple of them. I only use the my-elogram in doubtful cases. In other words if the case is not clinically clear-cut enough for me out of my experience to make a diagnosis, I resort to the myelogram. The myelogram I would say is in a certain percentage of cases confirmatory. I would dare say about -fifty per cent of the cases where they have been positive have- been confirmed' by operation. - I would, say that fifty per cent of the cases which have been positive have not been confirmed by opera? tiort. In such cases it was found that the filling defect upon the X-ray and fluoroscopic examination was produced by an enlarged, dilated vein, or by fatty tissue; and to that extent the myelogram is misleading on both sides.
“Sometimes you have confirmatory mye-lographic evidence and you do not find a disc. About fifty per cent of the cases where you have confirmatory myelographic evidence you do; but I base my operating ■practice upon the clinical findings, and use the myelogram in doubtful cases.”
Dr. E. H. Naurer testified :
“Q. Are you familiar with the myelo-gram test? A. I am. It is not conclusive. Until the statistics prove that it is the only way to make a diagnosis, I am not going to adopt this procedure.
******
“Q. So that, I say, a negative myelo-gram test, then, would certainly be consistent with a finding that a person did not suffer from — I mean, has not suffered from that injury? A. It is not conclusive at all.
******
“Q. But it is resorted to for the purpose of confirming a diagnosis, and a negative test would certainly be consistent with a negative finding of a ruptured disc, wouldn’t it? A. No, not negative. It could be negative and still have a ruptured disc.”
In view of the foregoing testimony, it is our opinion that the trial judge has not erred in his evaluation of this phase of the expert medical testimony.
It will be observed that two medical experts testified on behalf of plaintiff and four on behalf of defendants. Obviously the numerical preponderance of medical testimony contained in the record is in favor of defendants, however, we are unwilling, in view of no manifest error on the *118 part of the trial judge, involving an unadulterated question of "fact, to substitute" our judgment for' his and ¡express the unequivocal opinion that the medical expert testimony preponderates in favor of the defendants. On the contrary, we-are of the opinion'that plaintiff has sustained the burden of proof resting on him to establish by ii fair preponderance of the evidence that-he was the recipient of' a rupture of the fifth intervertebral disc/as a result -of the accident which-occurred on -February. 27, 1946.
We. are, 'therefore, of the opinion that the judgment of' the court, a qua, should not be disturbed.
For the reasons assigned the judgment appealed from is affirmed.’ ' '
Affirmed. , .